## In re BARNARD'S WILL.

(Surrogate's Court, Essex County. September 18, 1912.)

1. WILLS (§ 166*)—CONTEST—UNDUE INFLUENCE—EVIDENCE.

In a will contest, evidence *held* to show that the will was not the result of coercion and undue influence asserted upon the decedent by the beneficiary.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

2. WILLS (§ 405*)—PROBATE—CONTEST—ASSESSMENT OF COSTS.

Costs in an application for the admission of a will to probate will not be taxed personally against contestants on a finding against them, but will be made payable out of the estate, where the circumstances apparently justified the contest.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 879–884; Dec. Dig. § 405.*]

3. WILLS (§ 164*)—CONTEST—UNDUE INFLUENCE—LATITUDE OF EXAMINATION.

In a will contest, in which undue influence on the part of the beneficiary is charged, wide latitude in the examination of witnesses is permis-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

sible, where it is shown that the will contested was executed soon after another of a different character.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 403–414; Dec. Dig. § 164.*]

In the matter of proving the last will and testament of Mary P. Barnard. Will admitted to probate.

W. R. Kellogg and A. W. Boynton, for proponent.

Frost, Daring & Warner (J. S. Frost, of counsel), for contestants.

PYRKE, S. [1] The only objection to the probate insisted upon is that the will was the result of coercion and undue influence exerted upon the decedent by the beneficiary, Ada G. Douglass. The will was executed on March 14, 1911, and the decedent died on January 15, 1912. At the time of the making of the will Miss Barnard was in her seventy-ninth year, and was the owner of a few thousand dollars. She was a maiden lady, and had not maintained a home of her own for many years, if ever. She had lived for some 16 years prior to her death in the home of Ada G. Douglass, of Westport. Her near relatives consisted of a brother and nephews and nieces. All of these relatives lived in distant states, excepting a niece, who resided at Westport, and a nephew, residing at Plattsburgh, N. Y. She was warmly attached to Westport as a place of residence, and was exceedingly reluctant to live elsewhere. In the home of Miss Douglass she was well and kindly treated, and during a number of illnesses which she suffered while there Miss Douglass gave to her the attentions which ordinarily would be expected only of a daughter. She had certain eccentricities of thought and action which militated against her desirability as an inmate of one's home. For the care and attention she received at the Douglass home she had paid up until the time of the execution of this will $3 per week. Miss Douglass had been dissatisfied for some years with the arrangement under which Miss Barnard was with her, and the matter of her being provided for elsewhere had been the subject of correspondence with relatives of the decedent. She had, however, suffered her to remain, apparently through motives of sympathy. Miss Barnard was naturally a woman of strong mentality and inclined to be self-willed, and these qualities of mind were modified but slightly by advancing years.

In January, 1911, Miss Barnard was attacked by an illness, which continued for about six weeks, and confined her to her bed. During such illness, and on the 7th of February, 1911, she made a hurried will, leaving her property in the main to a niece. The subject-matter of this will became known to Miss Douglass, and evidently to others living near by. Shortly after this will was made Miss Douglass notified the decedent and her business agent and adviser, Mr. George B. Richards, a business man of Westport, that she was unwilling to continue to have Miss Barnard at her home under the existing arrangement. Across the road from the Douglass home lived a Mrs. Eddy, a widow, whose husband in his lifetime had been the business ad-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

viser of Miss Barnard, and who was herself both a friend and neighbor of Miss Barnard and Miss Douglass. As soon as Miss Barnard had sufficiently recovered to leave the house, she called upon Mrs. Eddy, and told her of what Miss Douglass had said as to being unwilling to have her continue longer in her home, and added that she did not know what she was going to do, to which Mrs. Eddy replied that she thought Miss Douglass would keep her if she (Miss Barnard) was willing to do what was right. During the conversation alternative places of living were discussed, the situation of the relatives of Miss Barnard as a possible solution of the problem was considered, and as a conclusion of the inquiry it seemed to both Miss Barnard and Mrs. Eddy that the best thing for the former to do was to continue to live with Miss Douglass.

Thereupon Mrs. Eddy summoned Mr. Richards to the conference, and the details of a proposed arrangement with Miss Douglass were gone over, and Mr. Richards was informed that Miss Barnard or Mrs. Eddy had talked with Miss Douglass, and that she was willing to take Miss Barnard and look after her for the remainder of her life, providing Miss Barnard would pay her $300 a year and in addition leave to her any property that she (Miss Barnard) might have at the time of her death, and the property was to be placed in Richards' hands to handle as the agent of Miss Barnard. This statement was made to Mr. Richards either by Miss Barnard or by Mrs. Eddy in Miss Barnard's presence and with her acquiescence. Miss Barnard also stated to Mr. Richards that she wanted him to act as executor and "attend to the matter." Mr. Richards told Miss Barnard that he was not capable of preparing the necessary papers, and that he thought he better consult a lawyer. Within a few days he went to a neighboring village and consulted an attorney, who prepared a form of an agreement, a form of a will, and a form of an assignment of certain property from Miss Barnard to Mr. Richards in trust. Mr. Richards then called upon Miss Barnard and showed her the papers which had been prepared, and they were read over by her.

Upon reading them over, she said that they were all right, except that she wished to leave certain personal effects to her nieces; that the will as it read gave everything to Miss Douglass, and that she wished it could be changed. Mr. Richards said that he would return the papers to the attorney and have the will redrawn. Miss Barnard replied not to do that, for him to change the draft of will so that Miss Douglass would get the bonds and mortgages and cash, and that she would leave it to him to see that her wishes in respect to her personal effects were carried out. Mr. Richards then changed the draft of will to the form in which it now appears, and Miss Barnard then told him to take the will and keep it safely until another witness could be present upon its execution. A few days later, upon an occasion when Mr. Richards was at the Douglass house with friends upon a social call, the will, agreement, and assignment were executed, and the arrangement went into effect and was carried out by both parties until the death of Miss Barnard. Some time after the making of her

will, Miss Barnard delivered to Mr. Richards a note stating that she wanted to give certain of her personal effects to specified relatives, and instructing him to see that her wishes were carried out.

On this résumé of the proofs it will be seen that there is not a scintilla of evidence upon which to base a claim of any influence of any kind being exerted by Miss Douglass upon Miss Barnard in respect to making a will in her favor. There is not an iota of proof that Miss Douglass, either directly or through any third party, ever so much as suggested to Miss Barnard that a new will be made. The most, and all, that Miss Douglass said was that she was unwilling to keep Miss Barnard under the present arrangement. In making this statement she was well within her rights, and the sentiment expressed in it was by no means unreasonable. The circumstance of its utterance shortly after the making of the earlier will cannot be regarded as changing a natural and reasonable statement into a threat or an instrument of coercion.

I am satisfied that the recitals in the agreement of March 14, 1911, are a true statement of the considerations which influenced Miss Barnard in entering into the arrangement in question, and are a correct picture of her mental attitude at the time. It appears from them that she was more concerned with making proper provision for maintenance and care during the sunset of her life than in hoarding her slender resources for the enrichment of those who, while professing solicitude for her welfare, lacked either the disposition or the ability to provide her with those creature comforts which her necessities so imperatively demanded. I am also satisfied that Mrs. Eddy and Mr. Richards, in expressing to Miss Barnard their approval of the proposed arrangement, were actuated by the worthiest motives. They were anxious that Miss Barnard should discharge her primary duty of insuring to herself a home for the balance of her days, and her secondary duty, if her resources survived her, to requite in some measure Miss Douglass for the services she had previously rendered, and for which she had not been adequately compensated.

[2] In conclusion, I can discover no reason for denying probate, and a decree should be entered admitting the will to probate, with costs to the proponent payable out of the estate. The suggestion that has been made that costs should be awarded personally against the contestants I cannot agree to. I do not question that the contest was initiated in good faith.

[3] The fact that this will was executed so soon after another will of a different character justified the next of kin in a searching investigation into the circumstances, and my desire not to hamper in any way such an inquiry is the reason for permitting what might seem from an inspection of the record as an overwide latitude to the able counsel for the contestants in the examination of witnesses.